Annick M. Persinger (CA Bar No. 272996)
**TYCKO & ZAVAREEI LLP**
1970 Broadway., Suite 1070
Oakland, CA  94612
(510) 254-6808
*apersinger@tzlegal.com*

Hassan A. Zavareei (State Bar No. 181547)
Andrea R. Gold*
Lauren Kuhlik*
Glenn E. Chappell*
**TYCKO & ZAVAREEI LLP**
1828 L Street NW Suite 1000
Washington, DC 20036
(202) 973-0900
*hzavareei@tzlegal.com*
*agold@tzlegal.com*
*lkuhlik@tzlegal.com*
*gchappell@tzlegal.com*

*Counsel for Plaintiffs and the Proposed Classes*
*\*pro hac vice application forthcoming*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANTHONY RAMIREZ AND MASAKO
WILLIAMS, on behalf of themselves and all
others similarly situated,

               Plaintiffs,

      v.

BANK OF AMERICA, N.A.,

              Defendant.

Case No.

**CLASS ACTION COMPLAINT**

(JURY TRIAL DEMANDED)

**CLASS ACTION COMPLAINT**

Plaintiffs Anthony Ramirez and Masako Williams, on behalf of themselves and all persons similarly situated, allege the following:

**INTRODUCTION**

1.     The deadly COVID-19 pandemic created the worst economic crisis since the Great Depression.[1] From the fourth quarter of 2019 through the second quarter of 2020, the U.S. economy contracted by more than 19 percent, the worst downturn ever recorded.[2] In March 2020 alone, business shutdowns and closures designed to limit the spread of the coronavirus threw more than 22 million people out of work, a mass layoff of record proportions.[3] The impacts fell disproportionately on low-income workers, with more than half of all job losses occurring in industries with low average wages.[4] In the months that followed and throughout the pandemic, households—particularly people of color—have faced significant economic hardship, including increased hunger and difficulty making rent.[5]

2.     During the pandemic, many banking customers facing these financial difficulties were drawn into a cycle of high overdraft and insufficient funds fees that further threatened their financial well-being.

---

[1] *See, e.g.*, David C. Wheelock, Fed. Reserve Bank St. Louis, *Comparing the COVID-19 Recession with the Great Depression*, 39 Economic Synopses 1, 4 (2020) ("By almost any measure, the 2020 recession began with sharp declines in economic activity, employment, and equity prices that rivaled or exceeded the initial declines of the Great Depression.").

[2] Lucia Mutikani, *U.S. economy contracted 19.2% during COVID-19 pandemic recession*, Reuters (July 29, 2021), https://www.reuters.com/business/us-economy-contracted-192-during-covid-19-pandemic-recession-2021-07-29/.

[3] *Id.*

[4] Ctr. on Budget & Policy Priorities, *Tracking the COVID-19 Economy's Effects on Food, Housing, and Employment Hardships* 9 (last updated Nov. 10, 2021), https://www.cbpp.org/sites/default/files/8-13-20pov.pdf.

[5] *Tracking the COVID-19 Recession's Effects on Food, Housing, and Employment Hardships*, CENTER ON BUDGET & POLICY PRIORITIES (updated Aug. 9, 2021), *available at* https://www.cbpp.org/research/poverty-and-inequality/tracking-the-covid-19-recessions-effects-on-food-housing-and.

3.     Illustrating the punitive nature of these fees, a 2014 Consumer Financial Protection Bureau (CFPB) study found that most such fees are incurred on transactions of $24 or less, and that consumers repay the majority of those overdrafts in three days or less.[6] "Put in lending terms, if a consumer borrowed $24 for three days and paid the median overdraft fee of $34, such a loan would carry a **17,000 percent** annual percentage rate (APR)."[7]

4.     During this economic crisis, legislators, regulators, and the public alike called for banks to put a stop to these predatory fees. Indeed, during the pandemic, "overdraft fees [we]re among the most complained-about bank practices at the CFPB."[8] In response to these complaints and the disproportionate impacts of these punishing fees on the financially vulnerable, lawmakers pushed to reform these practices. In March 2020, Senators Cory Booker and Sherrod Brown introduced legislation to temporarily ban overdraft fees during the pandemic emergency.[9] These Senators explained:

> Millions of hardworking Americans have been thrown into financial insecurity because of this unprecedented global pandemic …. For these individuals, and those vulnerable before the outbreak, one $35 overdraft charge can lead to financial free fall. Overdraft fees generate enormous amounts of revenue for banks while customers often don't even know they've opted into such charges. Worse, such fees fall on those least likely to be able to afford them. Our bill would end these unfair, exploitative practices during the Coronavirus emergency.[10]

5.     Federal regulators also pushed banks to help their customers. On March 13, 2020, the Office of the Controller of the Currency issued guidance encouraging banks to "take steps to meet the financial services needs of customers adversely affected by COVID-19-related

---

[6] Press Release, *CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges*, U.S. Consumer Fin. Prot. Bureau (July 31, 2014), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finds-small-debit-purchases-lead-to-expensive-overdraft-charges/ (emphasis added).
[7] *Id.*
[8] Matt Egan, *Banks make billions on overdraft fees. Biden could end that*, CNN Business (Oct. 12, 2020), https://www.cnn.com/2020/10/12/business/bank-overdraft-fees-biden/index.html.
[9] Sen. Cory Booker, *Booker, Brown to File Legislation to Temporarily Ban Overdraft Fees* (Mar. 23, 2020), https://www.booker.senate.gov/news/press/booker-brown-to-file-legislation-to-temporarily-ban-overdraft-fees.
[10] *Id.*

issues," and specifically asked that they waive overdraft fees.[11] The guidance explained that such relief "serve[s] the long-term interests of communities and the financial system" and is "consistent with safe and sound banking practices and applicable laws."[12]

6.      State officials also asked banks to provide relief from these fees. For example, in March 2020, New York's governor issued an executive order instructing the state's Department of Financial Services to require state-chartered banks to waive overdraft fees and other account fees to help lessen the financial hardship of the pandemic on New Yorkers.[13] That same month, the Secretary of California's Business, Consumer Services & Housing Agency and its Commissioner of Business Oversight jointly issued guidance to financial institutions in the state whose customers "may be suffering from loss of income or other financial hardship as a result of the COVID-19 pandemic."[14] They specifically encouraged banks to waive overdraft and other account fees during the state of emergency.[15] And also that same month, the Illinois Department of Financial and Professional Regulation "strongly urge[d] banks and credit unions to respond to borrowers affected by the current economic environment" by waiving overdraft and other account fees.[16]

---

[11] U.S. Office of the Controller of the Currency, OCC Bulletin 2020-15, Pandemic Planning: Working With Customers Affected by Coronavirus and Regulatory Assistance (Mar. 13, 2020), https://www.occ.gov/news-issuances/bulletins/2020/bulletin-2020-15.html.

[12] Id.

[13] Press Release, N.Y. Dep't Fin. Servs., Governor Cuomo Signs Executive Order Mandating Businesses That Require In-Office Personnel to Decrease In-Office Workforce by 75 Percent (Mar. 19, 2020), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr20203191.

[14] Lourdes Castro Ramirez, Sec'y, Cal. Bus., Consumer Servs. & Housing Agency & Manuel P. Alvarez, Comm'r, Cal. Bus. Oversight, *Guidance to Financial Institutions During the COVID-19 Pandemic* 1 (Mar. 22, 2020), https://www.bcsh.ca.gov/coronavirus19/dbo_banks.pdf.

[15] Id. at 2.

[16] Press Release, Ill. Dep't Fin. & Prof'l Regulation, Illinois Department of Financial and Professional Regulation Announces Help for Consumers Struggling to Make Payments on their Debts Due to the COVID-19 Crisis and Guidance for its Regulated Financial Sectors (Mar. 30, 2020),
https://www.idfpr.com/News/2020/2020%2003%2030%20IDFPR%20financial%20guidance.pdf.

7.      In light of this ongoing public pressure and the threat of legislative action, Defendant Bank of America, N.A. ("BANA") promised that it would refund punitive fees that hurt its most vulnerable customers, including overdraft and insufficient funds fees.

8.      BANA did not keep its promises. While hundreds of thousands of consumers lost their jobs and went hungry, BANA reaped enormous profits. In addition to collecting billions of dollars from its most vulnerable consumers,[17] BANA collected federal hand-outs. While earning up to $767 million from administering Paycheck Protection Program loans,[18] BANA also benefitted from Federal Reserve overdraft penalty waivers. As one reporter put it, "while the federal government excused banks from paying overdraft penalties in a time of crisis, those very same banks turned around and continued to levy harsh overdraft charges on their neediest customers."[19]

9.      In an apparent bid at positive public relations, BANA told customers that they could "request refunds including overdraft fees, non-sufficient funds fees . . . and monthly

---

[17] Kelly Anne Smith, *Banks Charged Low-Income Americans Billions In Overdraft Fees in 2020*, FORBES (Apr. 21, 2021), *available at* https://www.forbes.com/advisor/personal-finance/how-to-prevent-overdraft-fees/ ("Ninety-five percent of the overdraft fees consumers paid last year—$11.8 billion—were charged to people described by the [FinHealth] report's authors as financially vulnerable and financially coping. These households are defined by their struggle to spend, save, borrow and plan.").

[18] Stacy Cowley, *Despite Billions in Fees, Banks Predict Meager Profits on P.P.P. Loans*, NY TIMES (Oct 1, 2020), *available at* https://www.nytimes.com/2020/10/01/business/ppp-loans-bank-profits.html.

[19] Alexander Sammon, *Big Banks Charged Billions in Overdraft Fees During the Worst Months of the Pandemic*, THE AM. PROSPECT (Apr. 22, 2021), *available at* https://prospect.org/economy/big-banks-charged-billions-in-overdraft-fees-during-pandemic/ (observing that although overdraft fees decreased at the beginning of the pandemic, that was "a result of the substantial short-term cash assistance from the CARES Act, with its stimulus checks and boosted federal unemployment insurance.").

maintenance fees."[20] BANA also announced that it would "offer assistance to qualifying consumer . . . clients facing hardships, including forbearance with certain fees."[21]

10.    Moreover, BANA's customer terms of service make the bank's imposition of overdraft and insufficient funds fees discretionary—mandating that BANA exercise that discretion to the benefit of its customers, as opposed to its own interests, under its duty of good faith and fair dealing.

11.    Notwithstanding these representations and contractual duties, BANA never took the steps necessary to adhere to its promises and representations.[22] Instead, it rejected requests from its customers (including Plaintiffs) for the waiver of such fees.

12.    Mr. Ramirez and Ms. Williams both maintained personal checking accounts with BANA. Each experienced financial hardship during the pandemic that depleted their accounts and caused them to incur numerous overdraft and insufficient funds fees—exactly the types of fees that BANA promised to help customers with.

13.    But BANA failed to waive or refund these fees, despite repeated requests from Plaintiffs. BANA told Plaintiffs that they were "ineligible" for any relief, despite BANA's widely publicized public promises to waive such fees for struggling customers.

14.    In fact, upon information and belief, BANA maintained its pre-COVID policy of allowing only a very limited number of fee refunds, and refusing even to consider refunding any further fees, regardless of the customer's circumstances.

---

[20] Press Release, Bank of America, N.A., *Bank of America Announces Additional Support for Consumer and Small Business Clients Experiencing Hardship From the Impact of the Coronavirus* (Mar. 19, 2020), *available at* https://newsroom.bankofamerica.com/press-releases/consumer-banking/bank-america-announces-additional-support-consumer-and-small.

[21] Kelly Anne Smith & Daphne Foreman, *List of Banks Offering Relief to Customers Affected by Coronavirus (COVID-19)*, FORBES (Apr. 3, 2020), *available at* https://www.forbes.com/sites/advisor/2020/04/03/list-of-banks-offering-relief-to-customers-affected-by-coronavirus-covid-19/?sh=4ca551ea4efa.

[22] Sammon, *supra* note 19 ("But that was never a serious commitment. There are millions of instances of overdraft every year in the United States, and setting up a mass refund program would have required massive call center hiring and staffing to process that volume of requests. They were never serious about it, and it never amounted to much.").

15.     Numerous other customers were not even able to get through to BANA. In response to an online post by BANA about its COVID-19 resources, many people made the same complaints: hold times were long, nobody answered the phone, and when someone did answer, calls would be disconnected.[23] Despite promising to refund account fees during COVID-19, BANA did not even set up a system that would adequately allow its customers to request these promised refunds.

16.     And, as Plaintiffs' experiences confirm, customers who were able to get through were denied the fee refunds that BANA promised.  Even when BANA did grant refunds, it was under its non-discretionary, pre-COVID policies, meaning that the bank was not exercising discretion at all with regards to COVID-related requests, despite the language of the contract and the promises it made to customers to consider those requests and grant refunds.

17.     Even as its customers suffered, BANA continued to reap high profits from these vulnerable customers during the COVID-19 pandemic. In 2020, BANA made $1.1 billion from overdraft fees alone, and in the first nine months of 2021, it made $823 million solely from overdraft fees.[24]

18.     In the contract of adhesion it foisted on its customers, BANA granted itself discretion to choose whether to charge, waive, or refund OD and NSF fees. Then, in the wake of public pressure in the midst of the economic collapse caused by COVID-19, BANA promised customers that it would exercise its discretion in favor of its consumers by refunding fees during COVID-19.

---

[23]  Bank of America, N.A. Facebook Page (Mar. 13, 2020), *available at* https://www.facebook.com/BankofAmerica/posts/2800050740049144.

[24]  Bank of America, N.A., Consolidated Reports of Condition and Income 11 (September 30, 2021), *available at* https://cdr.ffiec.gov/Public/ViewFacsimileDirect.aspx?ds=call&idType=fdiccert&id=3510&date=09302021.

**CLASS ACTION COMPLAINT**

19.     These promises generated significant good press for BANA,[25] at a time when people began to question whether, given bank profits and the financial strain of bank fees on the most vulnerable among us, banks should even be allowed to charge such account fees.[26]

20.     As one policy analyst put it, "[y]ou're effectively charging people who don't have money for not having money."[27] Black and Hispanic customers are especially hard-hit, since they have disproportionately borne the brunt of the COVID-19 pandemic, including higher infection and death rates than whites, they have been likelier to lose their jobs and have lower income, and they are most likely to get hit with overdraft and other fees.[28]

21.     However, BANA refused to even consider many of the fee refund requests it had solicited. It thus misled its customers—as well as potential customers—and exercised its discretion solely in its own favor, without taking into consideration the circumstances of an unprecedented global pandemic and corresponding economic disaster and the financial benefits it received from the federal government as well as the promises it had made to its customers.

22.     Plaintiffs bring this action on behalf of themselves and a class of all similarly situated consumers against BANA. They challenge (1) BANA's systematic violation of its covenant of good faith and fair dealing, flowing from BANA's failure to consider requests for

---

[25] *See, e.g.*, Elizabeth Gravier, *Bank of America Waives Fees, Defers Payments on Credit Cards, Some Mortgages and Auto Loans During Coronavirus*, CNBC (Aug. 30, 2020), *available at* https://www.cnbc.com/select/bank-of-america-coronavirus-assistance/; *BOA Offering Refunds on Fes, Loan Deferrals*, PAYMENTS DIVE (Apr. 10, 2020), *available at* https://www.paymentsdive.com/ex/mpt/news/boa-offering-refunds-on-fees-loan-deferrals/ (hereinafter, Gravier, *Bank of America Waives Fees*); Ellen Chang, *These Banks are Waiving Overdraft Fees Because of the Coronavirus*, US NEWS (Mar. 24, 2020), *available at* https://money.usnews.com/banking/articles/these-banks-are-waiving-overdraft-fees-because-of-the-coronavirus (hereinafter, Chang, *These Banks are Waiving Overdraft Fees*).
[26] Chicago Sun Times Editorial Board, *Abolish Bank Overdraft Fees That Prey on People Who Can Least Afford Them*, CHICAGO SUN TIMES (June 3, 2021), *available at* https://chicago.suntimes.com/2021/6/3/22507650/overdraft-fees-ally-financial-elizabeth-warren-editorial.
[27] Evan Weinberger, *Overdraft Fees Fall on Customers Hit Hardest By Virus*, BLOOMBERG LAW NEWS (June 11, 2020), *available at* https://news.bloomberglaw.com/banking-law/overdraft-fees-fall-on-customers-hit-hardest-by-virus.
[28] *Id.*

8

**CLASS ACTION COMPLAINT**

refunds of OD Fees and NSF Fees, despite reserving the discretion to charge or not charge these fees and despite promising customers that it would exercise its discretion in *their* favor during the deadly COVID-19 pandemic; (2) BANA's unjust enrichment through its knowing retention of the benefit of OD and NSF fees, despite its promise to refund those fees to consumers; and (3) BANA's violation of the unfair trade practices laws of California and Texas through its misrepresentations that it would refund OD fees and NSF fees levied during the COVID-19 pandemic.

23.     BANA retains the discretion to charge accountholders the following fees relevant to these allegations: (1) a $35 NSF fee when there are insufficient funds to pay a transaction and it *rejects* the charge; and (2) a $35 OD fee when there are insufficient funds to pay a requested transaction and it *accepts* the charge. Collectively, these fees are referred to herein as "BANA Account Fees."

24.     BANA's profits remained high throughout the global pandemic, and many of these profits came directly from these punishing Account Fees. These punitive fees are, by definition, most impactful on consumers who already have minimal funds in their accounts.[29] As described herein, the illegal fee practices at issue in this litigation, and that make up a significant part of BANA's multi-billion-dollar fee revenue stream, are charged improperly and in violation of the good faith and fair dealing clause inherent in BANA's contract of adhesion. These fees are also charged illegally to the extent that BANA falsely represents to customers that it will refund them.

25.     It is a breach of the covenant of good faith and fair dealing for BANA to (1) provide itself discretion as to whether to charge or waive overdraft and insufficient funds fees; (2) promise customers that it would waive such fees; (3) refuse to take into consideration the circumstances of a global pandemic and worst economy since the Great Depression, the money

---

[29]  Smith, *supra* note 17 (95% of the $12.4 billion collected in overdraft fees in 2020 came from people "defined by their struggle to spend, save, borrow, and plan" and Black and Latinx households are disproportionately impacted, likely due to structural inequality and discrimination that impact their ability to access financial health).

that was provided to it by the federal government, and the harm these fees would impose on vulnerable customers when determining not to exercise discretion in customers' favor; and (4) either fail to exercise discretion at all by failing to setup a system for considering the financial hardship of customers who request a waiver of those fees or consistently exercise its discretion in its own favor. These actions deny BANA's most vulnerable customers the full benefit of the contract that BANA itself wrote.

26.     It is likewise a violation of the California Unfair Competition Law, California Business and Professions Code section 17200, *et seq.*, and the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*, to deceive customers by promising to refund OD and NSF fees, and then systematically refuse to do so. These false promises are misrepresentations that are likely to mislead the public as to whether account fees will be refunded during the COVID-19 pandemic. Plaintiffs relied on and suffered financial harm from these promises because they would have taken action to avoid these punitive fees had they known that BANA was going to continue to assess them during this time of extraordinary financial hardship.

27.     BANA also unjustly enriched itself at the expense of its customers by retaining the benefit of OD and NSF fees, despite its promise to refund those fees to struggling customers.

28.     Plaintiffs and other Class members have been injured by BANA's improper practices. On behalf of themselves and the Class, Plaintiffs seek damages, restitution, and injunctive relief for BANA's violation of the covenant of good faith and fair dealing and for the violation of the California Unfair Competition Law and the Texas Deceptive Trade Practices-Consumer Protection Act, and disgorgement of the wrongful and inequitable proceeds received by BANA due to its unjust practices.

## JURISDICTION AND VENUE

29.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of

interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than BANA.

30.     This Court has jurisdiction over BANA because it regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District and in this State.

31.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because BANA is subject to personal jurisdiction here and regularly conducts business in the District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

### PARTIES

32.     Plaintiff Anthony Ramirez is of majority age and a citizen and resident of California. Mr. Ramirez maintains a personal checking account at BANA and did so at all times relevant.

33.     Plaintiff Masako Williams is of majority age and a citizen and resident of Texas. Ms. Williams maintains a personal checking account at BANA and did so at all times relevant.

34.     Defendant Bank of America, N.A. is a national bank with its headquarters and principal place of business in Charlotte, NC. Among other things, BANA is engaged in the business of providing retail banking services to consumers. BANA operates banking centers, and thus conducts business, throughout the State of California, including within this District.

### FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

35.     When a BANA checking account consumer attempts a transaction but has insufficient funds in the account to cover that transaction, BANA either approves the transaction into overdraft (and charges a $35 OD fee) or rejects the transaction (and charges a $35 NSF fee).

36.     These fees and how and when they are to be charged are discussed in BANA's contracts with customers.

37.     BANA, in the contract of adhesion it wrote that governs its relationship with checking account customers, reserves itself the discretion to charge or waive OD and NSF fees.

38.     Nevertheless, BANA failed even to set up a system that would allow customers to request refunds and customer service representatives to issue refunds.

39.     In promising customers that it would provide relief, including refunds for OD and NSF fees, BANA promised to exercise its discretion in favor of its most vulnerable customers who had suffered financial difficulty during the COVID-19 pandemic.

40.     Its refusal to do so, instead exercising its discretion to its own benefit to collect astronomical profits from OD and NSF fees while its most vulnerable customers suffered, violated the duty of good faith and fair dealing that inheres in every contract.

41.     This refusal to abide by its own promise also misled customers and tended to mislead the public.

## I.     BANA PROMISES TO EXERCISE ITS DISCRETION FAIRLY

### A.     BANA's Promises to Customers Impacted by COVID-19

42.     BANA promised to help its customers during the COVID-19 pandemic.

43.     On March 19, 2020, BANA announced on its website that it is "offering assistance to clients through its Client Assistance Program . . . Working on a case-by-case basis, . . . Bank of America's additional assistance for clients impacted by the coronavirus includes: Consumer and Small Business deposit accounts: clients can request refunds including overdraft fees, non-sufficient funds fees, . . . and monthly maintenance fees."

44.     In that same timeframe, BANA also told customers on its website: "Need assistance with your payments? We can help now. Consumer and small business deposit clients can request refunds for overdraft fees, non-sufficient funds fees, and monthly maintenance fees." This representation remained on BANA's website through at least June 17, 2020.

45.     On March 12, 2020, BANA reported to Forbes that it "offer[ed] assistance to qualifying consumer and small business clients facing hardships, including forbearance with

certain fees." On March 24, 2020, its head of consumer, small business, and wealth management client care told CNBC: "Our teams are ready to help clients and small businesses, and we are especially focused on the needs of those experiencing hardship due to the current situation. . . . If you have been negatively impacted by coronavirus and need additional assistance related to your account please visit our website or you can give us a call."[30] And, that same day, it claimed through *U.S. News & World Report* it would "skip" OD fees for customers who "call and request it."[31]

46.    Taken together, these representations indicate that BANA promised customers that it would refund OD and NSF fees that it had issued during the pandemic.

47.    Because BANA failed to refund fees upon request and did not set up a system that would allow customer service representatives to do so, these promises deceived reasonable customers into believing that they could get their account fees refunded during the COVID-19 pandemic.

**B.    BANA's Relevant Contracts**

48.    Transactions involving deposit accounts at BANA are governed by the Deposit Agreement and Disclosures (Deposit Agreement) and the Online Banking and Transfers Service Agreement (Online Banking Agreement), which together form an adhesion contract drafted by BANA.

49.    According to the Online Banking Agreement, BANA promises to exercise discretion on whether or not to charge OD fees and NSF fees by saying it "may" charge such fees:

> If enough funds to complete the transfer or payment are not available, we may either (i) complete the transaction and overdraw the account or (ii) refuse to complete the transaction. In either case, we *may* charge a non-sufficient funds (NSF), returned item, overdraft, or similar fee.

* * *

---

[30] Gravier, *Bank of America Waives Fees, supra.*
[31] Chang, *These Banks are Waiving Overdraft Fees, supra.*

**CLASS ACTION COMPLAINT**

> An NSF-fee, returned item, overdraft or similar fee *may* also apply if you schedule payments or transfers and your available balance is not sufficient to process the transaction on the date scheduled or, in the case of a personal check, on the date when the check is presented to us for payment.

(emphases added).

50. BANA's Deposit Agreement confirms that BANA gives itself discretion to charge or not charge these fees. The version of BANA's Deposit Agreement and Disclosures in place from March 2020 until November 12, 2021 stated:

> We *may* deduct fees, overdrafts and other amounts you owe us under this Agreement from your accounts with us or our affiliates …. We *may* make these deductions at any time without prior notice to you or request from you. If there are not enough funds in your account to cover the amounts you owe us, we *may* overdraw your account, without being liable to you. You agree to pay immediately all fees, overdrafts, and other amounts you owe us.

(emphases added).

51. Similarly, the version of BANA's Deposit Agreement and Disclosures that went into effect on November 12, 2021, and remains in effect, states:

> We *may* deduct fees, overdrafts and other amounts you owe us under this Agreement from your accounts with us or our affiliates …. We *may* make these deductions at any time without prior notice to you or request from you.

> \*\*\*

> The Schedule of Fees for your account explains when we charge you fees for overdrafts and for declined or returned items and the dollar amount of the fees. We *may* charge fees for overdrafts or for declined or returned items for transactions, including for transactions between multiple Bank of America accounts you hold.

(emphases added).

52. Consistent with BANA's representations in its contracts, on its website, and elsewhere, Plaintiffs and reasonable consumers understand that BANA has discretion over whether to charge, refund, or waive overdraft and NSF fees. They further understand that BANA agreed to exercise its discretion fairly, particularly that this discretion would not be exercised solely to the detriment of its most vulnerable customers, especially during the COVID-19 pandemic.

53.     The contracts, together with the website promises, indicate that BANA will exercise its discretion in favor of *customers*, not itself.

## II.    BANA FAILED TO ABIDE BY ITS PROMISES TO REFUND PLAINTIFFS' OD AND NSF FEES

### A.    Mr. Ramirez's Experiences

54.     Mr. Ramirez, 39, works as a truck driver. He is a longtime customer of BANA. Prior to the COVID-19 pandemic, he incurred few, if any, OD or NSF fees.

55.     During the pandemic, however, work dried up and his hours fell, which made it difficult for him to keep up with his bills and care for his family. In August 2021, he overdrew his account. Over the next two months, BANA assessed a combined total of $245 in OD and NSF fees. These charges consisted of six NSF fees at $35 each for returned items, and one $35 OD fee.

56.     In 2020 and 2021, Mr. Ramirez saw reports that large banks, including BANA, were promising relief from Account Fees to customers suffering from financial hardship. This influenced the way he used his checking account and prompted him to seek relief from these fees. Each month (August, September, and October 2021) when he got his account statements, Mr. Ramirez called BANA to request relief from the OD and NSF fees assessed by BANA. He spoke to three different customer service representatives. He told each representative to whom he spoke that he had overdrawn his account as a result of the financial hardships caused by the COVID-19 pandemic.

57.     Nevertheless, each BANA representative denied his request on the spot without any further investigation or consideration of his circumstances. Each told him that he did not qualify for any relief program. The only reason any of these BANA employees gave him for denying relief was that he was ineligible for any fee refunds as long as his account was still overdrawn. This made no sense to him because a customer with an overdrawn account is a customer in greatest need of help.

58.     The statements by each of these BANA representatives led Mr. Ramirez to believe that BANA had no process or program for considering or granting relief for its financial customers hardships during the pandemic, despite the explicit promises BANA had made.

59.     Mr. Ramirez worked with a tight budget each month during the pandemic because of its effects on his work hours. He never intentionally overdrew his checking account, but the money coming in sometimes simply wasn't enough to cover his bills. Had he known that BANA did not intend to keep its promises to use its discretion to grant customers relief from OD and NSF fees during the pandemic, he would have taken additional steps to ensure that he did not overdraw his account and incur these fees, such as seek help from family members or obtain a small loan to increase his balance. Some of these alternative measures might have been expensive, but they still would have cost less than BANA's punitive fees. But because of BANA's promises to help, he did not believe these less costly steps were necessary.

**B.     Ms. Williams' Experiences**

60.     Ms. Williams is an 85-year-old immigrant with limited English-language fluency. Prior to the pandemic she relied on her family to supplement her $770 per month social security income to make ends meet.

61.     During the COVID-19 pandemic, however, Ms. Williams' family became less financially stable, like many Americans. Some members of her family lost their jobs, and the financial strain impacted the entire family. As a result, they were unable to assist Ms. Williams, and she had to survive solely off her SSI checks.

62.     As a result, Ms. Williams, who is unable to work or earn any other income, was forced to use up her Social Security checks each month just to ensure that she could continue to have shelter and food. As a result, she overdrew her checking account.

63.     BANA charged Ms. Williams OD fees nearly every month during the pandemic. Specifically, it charged her a $35 OD fee in July, August, September, and December of 2020, and again in February, March, April, and May of 2021.

64.      Ms. Williams saw BANA's statements in the first half of 2020 that it would provide relief to consumers suffering from financial hardship during the pandemic on her local nightly news. This prompted her to both keep depositing her money with BANA and seek relief from the OD fees BANA charged to her account.

65.      Through her son, David Williams, Ms. Williams called BANA several times to attempt to get the OD fees refunded. Mr. Williams explained to BANA that their family was facing financial strain and hardship due to COVID-19, but BANA consistently refused to refund the fees.

66.      At least one BANA customer service representative told Mr. Williams that Ms. Williams did not qualify for refunds, and another stated that the computer program used would not allow the representative to process the refund. Thus, BANA refused to even allow representatives to exercise discretion to refund these fees, despite the discretion promised in the contract and BANA's explicit promises to waive OD fees during the COVID-19 pandemic.

67.      In August 2021, Mr. Williams again requested that BANA refund all the OD fees that it had charged her during the pandemic, on the basis that BANA had promised to do so, and in the face of financial problems caused by the COVID-19 pandemic. A customer service representative refused to even consider any fees that had been charged more than 90 days earlier, informing Mr. Williams that the "system" would not allow fee refunds beyond that time period. In other words, despite BANA's explicit promise to refund OD fees during the COVID-19 pandemic, it failed to implement a system that would even allow the exercise of discretion, much less the actual reversal or refund of relevant fees.

68.      It did not refund any of these fees, despite the promises that it made on its website, in the media, and elsewhere.

69.      Had Ms. Williams known that BANA did not intend to keep its promises to use its discretion to grant customers relief from OD and NSF fees during the pandemic, she would have taken steps to avoid these punitive fees. Specifically, she would have moved her checking account to another bank that had eliminated these fees or a bank that would have followed

**CLASS ACTION COMPLAINT**

through on its promises to provide relief to struggling customers. But BANA's statements led her to take no action because she reasonably believed that BANA would exercise its discretion in her favor.

## CLASS ALLEGATIONS

70.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

71.     The proposed classes are defined as:

> **Nationwide class:** All BANA consumer checking accountholders in the United States who, after March 12, 2020, were charged overdraft fees or insufficient funds fees by BANA after BANA promised to consider waiving such fees due to the pandemic, attempted to seek a refund, and did not receive a refund for such fees.

> **Alternative California-only class:** All BANA consumer checking accountholders in California who, after March 12, 2020, were charged overdraft fees or insufficient funds fees by BANA after BANA promised to consider waiving such fees due to the pandemic, attempted to seek a refund, and did not receive a refund for such fees.

> **Alternative Texas-only class:** All BANA consumer checking accountholders in Texas who, after March 12, 2020, were charged overdraft fees or insufficient funds fees by BANA after BANA promised to consider waiving such fees due to the pandemic, attempted to seek a refund, and did not receive a refund for such fees.

The National Class and State Classes are collectively referred to herein as the "Classes."

72.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

73.     Excluded from the Classes are BANA, its parents, subsidiaries, affiliates, officers and directors, any entity in which BANA has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

74.     The members of the Classes are so numerous that joinder is impractical. Each Class consists of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to BANA's records.

75.     The Plaintiffs' claims are typical of the claims of the Class they seek to represent in that the representative Plaintiffs, like all Class members, were denied the benefit of their contract with BANA when it promised to exercise its discretion to charge or waive OD and NSF fees in favor of its customers during the COVID-19 pandemic, and then refused to even consider requests for waiver or refunds. The representative Plaintiffs, like all Class members, have been damaged by BANA's misconduct in that they been denied the benefit of their contract with BANA through the unfair imposition of Account Fees, to BANA's extremely profitable benefit, despite the promise to exercise discretion in the choice to charge or waive such fees. Their claims are also typical of the Class they seek to represent in that BANA made misrepresentations to them in promising to refund OD and NSF fees and then systematically refusing to do so. The Plaintiffs, like all class members, have been harmed by these wrongful business practices. Furthermore, the factual basis of BANA's misconduct is common to all Class members and represents a common thread of refusal to exercise its discretion fairly, resulting in injury to all members of the Classes.

76.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

77.     Among the questions of law and fact common to the Classes are:

     a.     Whether BANA breached its covenant of good faith and fair dealing with Plaintiff and other members of the Class through its BANA Account Fee policies and practices;

     b.     Whether BANA unjustly enriched itself through its Account Fee policies and practices;

**CLASS ACTION COMPLAINT**

c.    Whether BANA violated the California Unfair Competition Law and the Texas Deceptive Trade Practices-Consumer Protection Act through its fraudulent misrepresentations;

d.    The proper method or methods by which to measure damages; and

e.    Whether the Classes are entitled to declaratory and injunctive relief.

78.    Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful BANA Account fee policies and practices of BANA's Account Agreement and other related documents, as well as BANA's promises to customers and to the public. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

79.    Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

80.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of BANA, few Class members could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and BANA's misconduct will proceed without remedy.

81.    Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and

provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

82.     Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

**COUNT I**

**Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of all Plaintiffs and all Classes)**

83.     Plaintiffs repeat paragraphs 1 through 82 above.

84.     Plaintiffs and BANA have contracted for bank account deposit and checking services, as embodied in BANA's Account Agreement and related documentation.

85.     Under the laws of California, Texas, and the states in which BANA does business, good faith is an element of every contract pertaining to the assessment of Account Fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

86.     A party to a contract violates the obligation of good faith in performance by exercising discretion reserved to it solely in its own favor, and contrary to the benefit of the other party, exercising it with a bad motive, exercising it dishonestly, or otherwise exercising it in bad faith. Doing so exploits the discretion to their benefit, particularly when, as here, the party exercising the discretion drafted the contract—thus reserving the discretion to itself—and exercises that discretion consistently against the benefit of a less powerful, less sophisticated consumer. Bad faith may be overt or may consist of inaction, and fair dealing may require more

than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of the power to specify terms.

87.     BANA has breached the covenant of good faith and fair dealing in the Account Agreement through its Account Fee policies and practices as alleged herein, because it failed to exercise the discretion it retained for itself in its contracts of adhesion to the benefit of its customers.

88.     BANA's Online Banking Agreement states that BANA "may charge a non-sufficient funds (NSF), returned item, overdraft, or similar fee" if insufficient funds are available to complete a transfer for payment. Similarly, BANA's Deposit Agreement states that BANA "may deduct fees, overdrafts and other amounts" from customers' accounts and "may charge fees for overdrafts or for declined or returned items." These provisions give BANA discretion to assess or waive OD and NSF fees.

89.     Rather than use this discretion to provide relief to customers suffering from financial hardship during the pandemic as promised, BANA instead exercised its discretion in its own favor. In doing so, BANA has unfairly interfered with the Plaintiffs' and the Classes' right to receive the benefits of the contract.

90.     Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the Account Agreement.

91.     Plaintiffs and members of the Classes have sustained damages as a result of BANA's breach of the covenant of good faith and fair dealing.

## COUNT II
### Unjust Enrichment
### (On Behalf of all Plaintiffs and all Classes)

92.     Plaintiffs plead this claim in the alternative. Plaintiffs repeat paragraphs 1 through 91 above.

93.     Plaintiffs, on behalf of themselves and the Classes, assert a common law claim for unjust enrichment.

94.     By means of BANA's wrongful conduct alleged herein, BANA knowingly provided banking services to Plaintiffs and members of the Classes that were unfair, unconscionable, and oppressive.

95.     BANA knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Classes. In so doing, BANA acted with conscious disregard for the rights of Plaintiffs and members of the Classes.

96.     As a result of BANA's wrongful conduct as alleged herein, BANA has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Classes.

97.     BANA's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

98.     Under the common law doctrine of unjust enrichment, it is inequitable for BANA to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of Account Fees on Plaintiffs and members of the Classes in an unfair, unconscionable, and oppressive manner. BANA's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

99.     The financial benefits derived by BANA rightfully belong to Plaintiffs and members of the Classes. BANA should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Classes all wrongful or inequitable proceeds received by it. A constructive trust should be imposed upon all wrongful or inequitable sums received by BANA traceable to Plaintiffs and the members of the Classes.

100.    Plaintiffs and members of the Classes have no adequate remedy at law.

## COUNT III

### California Unfair Competition Law Business and Professions Code § 17200
### (On Behalf of Anthony Ramirez and the California Class)

101.    Plaintiffs repeat paragraphs 1 through 100 above.

102.    BANA's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, *et seq.*

**CLASS ACTION COMPLAINT**

103.    The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

104.    By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable and sweeps within its scope acts and practices not specifically proscribed by any other law.

105.    Mr. Ramirez and the California Class bring this claim under the third prong, that of "fraudulent business act or practice."

106.    BANA committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when affirmatively and knowingly misrepresenting that it would refund OD and NSF fees. Such representations are likely to mislead the public.

107.    As a direct and proximate result of BANA's violations of the UCL's "deceptive" prong, Mr. Ramirez and members of the California Class have been, and will continue to be charged excessive OD and NSF fees, and thereby have suffered and will continue to suffer actual damages.

108.    Mr. Ramirez and the California Class request equitable relief to restore to them all money acquired by means of BANA's unlawful conduct, an injunction on behalf of the general public to prevent BANA from continuing to misrepresent its fee and waiver practices, and an award of attorneys' fees and costs under Cal. Code of Civ. Proc. § 1021.5.

**COUNT IV**
**Texas Deceptive Trade Practices-Consumer Protection Act**
**Tex. Bus. & Com. Code Ann. § 17.41 et seq.**
**(On Behalf of Masako Williams and the Texas Class)**

109.    Plaintiffs repeat paragraphs 1 through 108 above.

110.    BANA's conduct described herein violates the Deceptive Trade Practices-Consumer Protection Act (the "DTPA"), codified at Tex. Bus. & Com. Code Ann. § 17.41, *et seq*.

111.    Ms. Williams and the members of the Texas Class are consumers as defined by Tex. Bus. & Com. Code Ann. § 17.45(4).

112.    BANA is a "person" as defined by Tex. Bus. & Com. Code Ann. § 17.45(3).

113.    Under the DTPA, a consumer may maintain an action against any "person" for economic damages and injunctive relief to remedy, among other things, a false, misleading, or deceptive act or practice that is enumerated in Subsection (b) of Section 17.46 of the DTPA or any unconscionable action or course of conduct. Tex. Bus. & Com. Code Ann. § 17.50 (a)(1), (3).

114.    BANA engaged in unlawful conduct enumerated in Subsection (b) of Section 17.46. Specifically, BANA represented that its banking services had characteristics that they do not have, in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(5). In promising its personal checking account customers that they would be eligible for fee relief if they experienced financial hardship during the COVID-19 pandemic, BANA promised banking services with flexible OD AND NSF fee policies that took into account individual hardships, consistent with the discretion BANA gave itself in its contracts of adhesion. But BANA's banking services did not have this characteristic: they were rigid and made little or no exception for individual circumstances or hardships.

115.    Additionally, BANA failed to disclose information concerning its personal checking account services which it knew at the time it made its public promises to provide relief from OD and NSF fees during the COVID-19 pandemic, in violation of Tex. Bus. & Com. Code Ann. § 17.46(24). Specifically, BANA knew that it had not setup any process or system for considering individual circumstances or hardships when its customers requested relief from OD and NSF fees, or that it had no intention of providing such relief by exercising its discretion solely in its customers' favor. BANA's failure to disclose such information was intended to

induce consumers into signing up for or maintaining existing personal checking accounts with BANA because it simultaneously promised that it would provide relief in public statements. Consumers like Ms. Williams would not have kept their checking accounts with BANA had this information been disclosed. And other consumers would not have signed up for personal checking accounts with BANA had they known this information.

116.    BANA also engaged in an unconscionable course of action causing economic damage, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3). BANA's conduct was unconscionable because it made widely publicized promises to provide relief from OD and NSF fees to customers suffering financial hardship during the COVID-19 pandemic, but in reality BANA had no intention to provide such relief or did not setup any process or system for considering such hardships or providing such relief. This caused economic damage to consumers like Ms. Williams because they would not have signed up for or continued to maintain personal checking accounts with BANA had they known that BANA was engaging in this course of conduct.

117.    As a direct and proximate result of BANA's violations of the DTPA, Ms. Williams and members of the Texas Class have been, and will continue to be charged excessive OD and NSF fees during the COVID-19 pandemic, and thereby have suffered and will continue to suffer actual damages.

118.    Ms. Williams and the Texas Class request damages, an injunction on behalf of the general public to prevent BANA from continuing to misrepresent its fee and waiver practices and to require it to set up a process to refund fees consistent with its representations, and an award of attorneys' fees and costs under Tex. Bus. & Com. Code Ann. § 17.50.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.    Granting an injunction requiring BANA to disclose the actual circumstances under which refunds will be provided to all its customers;

2.      Granting an injunction requiring BANA to set up a system that will allow refunds to be granted, including requiring the issuance of refunds when a fee was incurred due to circumstances related to the COVID-19 pandemic;

3.      Restitution of all BANA Account fees paid to BANA by Plaintiffs and members of the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

4.      Disgorgement of the ill-gotten gains derived by BANA from its misconduct;

5.      Actual damages in an amount according to proof;

6.      Pre-judgment interest at the maximum rate permitted by applicable law;

7.      Treble damages and attorneys' fees as provided by law;

8.      Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

9.      Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.


Dated: February 10, 2022

Respectfully submitted,

Annick M. Persinger (CA Bar No. 272996)
**TYCKO & ZAVAREEI LLP**
1970 Broadway., Suite 1070
Oakland, CA  94612
(510) 254-6808
*apersinger@tzlegal.com*


Hassan A. Zavareei (State Bar No. 181547)
Andrea R. Gold*
Lauren Kuhlik*
Glenn E. Chappell*
**TYCKO & ZAVAREEI LLP**
1828 L Street NW Suite 1000
Washington, DC 20036
(202) 973-0900
*hzavareei@tzlegal.com*
*agold@tzlegal.com*
*lkuhlik@tzlegal.com*

**CLASS ACTION COMPLAINT**

gchappell@tzlegal.com

Attorneys for Plaintiffs and the Proposed Classes
*pro hac vice application forthcoming

**CLASS ACTION COMPLAINT**