UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| ANTHONY RAMIREZ, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>Defendant. | Case No. 22-cv-00859-YGR (RMI)<br><br>**ORDER RE: DISCOVERY DISPUTE**<br>Re: Dkt. No. 92 |

Now pending before the court is a jointly-filed letter brief setting forth four discovery disputes through which Plaintiffs wish to compel the production of documents and information falling into three categories, as well as a response to Plaintiffs' narrowed Interrogatory ("ROG") No. 16. *See* Ltr. Br. (dkt. 92) at 1-4. The court has previously set forth the background of this putative class-action case through which Plaintiffs (a number of bank customers who were assessed certain sums in the nature of overdraft and insufficient funds fees) allege that they were misled by Defendant's (hereafter, "the Bank") public statements regarding pandemic-related financial hardship programs. *See* Order (dkt. 79) at 1-2. Plaintiffs seek an order compelling the production of three categories of documents: (1) documents showing changes to business-as-usual practices; (2) documents governing and analyzing the implementation of the COVID Client Assistance Program ("CAP"); and, (3) documents attached to, or referenced in previously-produced documents. *Id*. at 1-3. The issues concerning the discovery disputes pending before the court have been adequately set forth in the Parties' Letter Brief and, pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the court finds the matter suitable for disposition without oral argument.

As to the first category – Plaintiffs seek, as they did before (*see* Order (dkt. 79) at 4-7), internal documents from the Bank concerning its return to business-as-usual practices vis-à-vis the alterations to the cap on fee refunds. *See* Ltr. Br. (dkt. 92) at 2. Plaintiffs contend they recently learned in September of 2020 that, "while the COVID-19 pandemic was raging and without any notice to customers," the Bank ended its additional pandemic-related insufficient funds / overdraft and fee refund assistance program "and actually decreased the number of refunds available to customers suffering hardship." *Id*. at 2. Plaintiffs submit that pre-pandemic, the Bank would refund a maximum of four fees; at the outset of the pandemic, the Bank briefly raised that cap to twelve; and "[t]hen, unannounced, [the Bank] reduced the cap down to two." *Id*. This was not a return to business as usual, according to Plaintiffs, because a cap of only two free refunds per year was less than its pre-pandemic cap of four free refunds. *Id.* Thus, Plaintiffs now seek documents concerning this change because of their asserted relevance to the truth of the Bank's public representations during this period – including the Bank's desire to help its customers. *Id*. Plaintiffs add that these documents are also relevant to damages and to determining the veracity of the Bank's interrogatory responses (which reportedly state that the Bank reverted or transitioned back to its business-as-usual practices). *Id*. Lastly, Plaintiffs submit that such documents would be responsive to a number of its previously-propounded requests for production ("RFP") and that the Bank's prior productions are deficient because the previous production has not sufficiently evidenced the changes the Bank made to its policies regarding these fees. *Id*.

As to the second category – Plaintiffs seek internal documention governing and analyzing the Bank's implementation of its pandemic-era fee relief program. *Id*. at 2-3. Specifically, Plaintiffs seek: (1) "the Deposit Team Cap Playbook document that [the Bank] consulted when determining the relief it would offer in response to Covid-19"; (2) certain email correspondence regarding implementation, termination, and/or administration of the fee relief program, "which appears based on the deposition testimony of [the Bank's] witnesses to contain additional information on whether the Bank fully implemented the pandemic hardship relief it promised"; and, (3) documents or reports concerning customer complaints and the daily, weekly, and monthly data on client hardship requests that informed the Bank's decision-making regarding its fee relief

2

1    program. *Id*.

2    With regards to the third category – Plaintiffs seek subsequent and/or updated versions of a
3    certain internal Bank document (referred to as Exhibit 82) discussing the fee relief program. *Id*. at
4    3. More specifically, Plaintiffs want multiple versions of the document because they contend that
5    it contains statements and communications the Bank made to customers across various platforms
6    during the pandemic, and Plaintiffs submit that "those statements may have evolved or been
7    updated as the pandemic progressed." *Id*. Plaintiffs also want any documents attached to and/or
8    referenced in another internal document (referred to as Deposition Exhibit 83), which is a policy-
9    change document memorializing the Bank's implementation of its fee relief program. *Id*. As to
10   relevance and proportionality, Plaintiffs submit that subsequent changes to these statements, as the
11   fee relief program or other programs changed, "bear directly on customers' understanding of the
12   relief [the Bank] claimed to be offering and how [the Bank] intended for its statements to be
13   understood." *Id*. Plaintiffs add that the Bank already produced Exhibit 83 "but inexplicably
14   withheld additional attached and referenced documents that provide the full context . . . [because]
15   [p]roducing a document without its attachments is akin to redacting a document, and [the Bank]
16   has provided no justification for doing so [as] [t]hese additional unproduced documents *may*
17   *contain* important information on [the Bank's] policy change, program implementation, or other
18   relevant information." *Id*. at 3-4 (emphasis added).

19   As to the fourth subject of the discovery dispute – Plaintiffs seek a response to ROG 16,
20   which asks the Bank to identify and briefly describe the COVID relief programs it implemented,
21   along with their start and end dates. *Id*. at 4. Plaintiffs state that despite their agreement to narrow
22   the initial list to 16 programs, and then to further reduce it to the 8 programs listed on the Bank's
23   still publicly available Coronavirus Fact Sheet, the Bank rejected these proposals. *Id*. Plaintiffs
24   submit that "the duration of these other programs speaks to whether [the Bank] designed
25   advertising about its Covid hardship relief to communicate a pandemic-long program, and thus is
26   probative of reasonable consumers adopting the belief that the Bank was offering this relief,
27   including with regard to NSF/OD Fees." *Id*. Plaintiffs add that "the duration of these other
28   programs *may* also bear on customer reliance on [the Bank's] representations because customers

United States District Court
Northern District of California

who used other [Bank] products and services *might have* understood the Bank's claims concerning NSF/OD Fees in the context of the Bank's other similar [] Covid-19 relief programs [offered by the Bank]." *Id*. (emphasis added). For the reasons stated by the Bank – as set forth below – the court disagrees with Plaintiffs' arguments about relevance and proportionality.

As to internal communications generally, the Bank responds by noting that Plaintiffs' previous requests to compel this sort of internal documentation were rejected as only marginally relevant (if not outright irrelevant) and disproportionate to the needs of the case; and the fact that they have now "elicited [deposition] testimony identifying certain documents does not moot the Court's order." *Id*. at 5. As to the CAP Playbooks which document the potential relief options available to product teams when the Bank activates CAP, the Bank submits that it has already produced documents evidencing the relief actually provided to consumers, as well as the public statements made to consumers, the combination of which should be all Plaintiffs require in order to make a case as to reasonable consumer expectations. *Id*. The Bank submits that any other information in the playbooks amount to policies considered but not implemented, which the Bank correctly notes that this court already declined to order the Bank to produce. *Id*. (citing Order (dkt. 79) at 6. Regarding complaint monitoring – the Bank responds by noting that its policies require each compliance and risk officer to report monthly based on a statistical sample of complaints in order to assess if the complaints sampled from their area were properly handled. *Id*. The Bank asserts that "Plaintiffs now demand those internal monitoring reports," despite the fact that the Bank reports having already produced "responsive complaints (including narrative summaries of each complaint and descriptions of how they were resolved) directly from its complaint repository," which the Bank contends are more informative as to the issues at the heart of this case than the compliance and risk officers' monthly reports as to sampled complaints. *Id*. Plaintiffs' portion of the letter brief does not address or otherwise respond to this contention. *See id*. at 2-3.

With respect to refund request monitoring – the Bank reports that the deposit team reviewed certain data regarding client hardship requests in order to evaluate and monitor trends in refund requests, which informed its decisions as to whether or not to extend or end the fee assistance programs at the heart of this case. *Id*. The Bank adds that Plaintiffs now seek reports of

that data because Plaintiffs claim these summary reports are relevant to the economic condition of the Bank's customers and the impacts of the pandemic on hardship requests – and while the Bank disagrees with Plaintiffs' assertion in this regard, the Bank also notes that these summary reports would be no more informative than the granular transaction-level data underlying the reports which, along with sworn testimony along these lines, the Bank reports having already produced. *Id*. As to the documents Referenced in Exhibit 83 – the Bank explains that Exhibit 83 is a screen-shot from its Universal Change Request Assessment ("UCRA") system, which it describes as a mechanism to solicit approvals for changes from control partners (risk assessment, compliance, and legal). *Id*. The Bank reports to having produced the form requesting hardship refund changes to implement CAP, and the Bank reports that it did not redact this form; it reports that it "produced the screen-shot in full but did not produce every document linked to it in the UCRA as that linked information concerns risk approvals that are required to implement a tech change, including a manager's approval and something referred to as a "speed-to-market exception documentation." *Id*. In short, the Bank contends that "[t]hese internal approvals of additional NSF/OD fee relief are not relevant to whether [its] public statements are misleading." *Id*. The court agrees.

As to Plaintiffs' efforts to seek discovery into other products (both pandemic-era products that are not at issue in this case, and pre-pandemic products) – the Bank argues that discovery into these areas is irrelevant and disproportionate to the needs of the case. *Id*. at 5-6. The Bank correctly points out that the court previously rejected Plaintiffs' effort to compel discovery related to the Bank's other pandemic-era policies, practices, and procedures (which are not at issue in this case). *Id.* (citing Order (dkt/ 79) at 6-7). More specifically, as to Plaintiffs' request to compel updated versions of Exhibit 82, the Bank submits that this is an internal presentation document for certain employees to understand what exactly the client assistance program was, and how it was deployed across the Bank's product lines in response to the pandemic. *Id*. at 6. The Bank submits that it "has produced documents and information showing specifically how the CAP was deployed for consumer deposit accounts [and while] Plaintiffs claim they need all additional versions of this overview presentation because it contains consumer-facing statements [the Bank submits that it has] already produced those statements separately." *Id*. Plaintiffs' portion of the letter brief does

not meaningfully respond to, or otherwise address, this contention. *See id.* at 3-4.

Regarding ROG 16, the Bank correctly notes that Plaintiffs did not propound the interrogatory that the court previously suggested. *Id.* Previously, in response to the overbreadth of some of Plaintiffs' discovery requests, which Plaintiffs justified only with the assertion that the duration of the pandemic is at the heart of this case, the undersigned rejected those requests and suggested that "[i]f Plaintiffs believe that the Bank's understanding of the 'duration of the pandemic lies at the heart of the case,' this information could easily be garnered through a narrowly-tailored interrogatory that would ask the Bank to identify a range of time between a pair of dates." *See* Order (dkt. 79) at 6. Instead, as the Bank points out, Plaintiffs have "asked for an overview and duration of relief for every aspect of the Bank's pandemic response [and] Plaintiffs omit that [the Bank] offered a narrowed compromise on July 9, 2024, which they rejected, and that on August 28, 2024 the Bank's Senior Vice President and Business Continuity Manager, who is responsible for coordinating CAP across all products, provided responsive deposition testimony based on her personal knowledge." *See* Ltr. (dkt. 92) at 6. The Bank notes that providing any further responses at this point would require it to collect additional information separately from each product team, which would be burdensome and which the Bank asserts would be pointless because the court already found information of this sort to be irrelevant. *Id.* The court agrees and will note that Plaintiffs' ROG 16 goes far afield from the court's previous suggestion to the effect that if Plaintiffs' believe that the Bank's perception of the duration of the pandemic is integral to this case, then Plaintiffs could have simply asked the Bank to state its belief as to the start and end dates of the pandemic.

Regarding Plaintiffs' desire to take discovery into pre-pandemic programs and internal communications regarding the "business as usual" ("BAU") hardship refund allowance, the Bank argues that this line of discovery also seeks irrelevant information, which is also burdensome and disproportionate to the needs of the case. *Id.* The Bank uses the term BAU to refer to its "normal process" regarding fee relief, and the deployment of CAP was a departure from BAU; thus, after the ending of CAP, the Bank reverted to BAU. *Id.* Under BAU "fee refund allowances (including but not limited to hardship refunds) are adjusted based on client demand." *Id.* The Bank reports

6

that prior to the pandemic, "[b]etween December 2019 and January 2020, [the Bank] decided to adjust the BAU hardship allowance from four refunds per year to two." *Id*. However, after that decision was made, but "[b]efore the change was implemented, [the Bank] deployed CAP in response to the pandemic, which increased the annual allowance to 12 [and] [w]hen the deposit team transitioned [back] to the BAU fee relief environment, it implemented the two-hardship-refund per year allowance, but all customers' annual counters were reset to zero so that any hardship refunds received (CAP or BAU) in the last 12 months would not be included in the new BAU hardship allowance." *Id*. While Plaintiffs seek documents regarding the Bank's deliberations pertaining to its adjustment to the BAU hardship refund allowance (which took place between December of 2019 and January of 2020), the Bank argues that those pre-pandemic deliberations are not relevant. *Id*. The Bank notes that while Plaintiffs suggest that the deliberations are relevant to the truth of the assertions made by the Bank to its customers – the Bank "never disclosed to the public or to any customers the hardship allowance available at any time," a contention which Plaintiffs never respond to or address. *See id.*; *see also id*. at 2-4. Thus, the Bank points out that its pre-pandemic deliberations regarding the BAU hardship allowance have no bearing on the truthfulness of its public statements (in March of 2020) that "additional" NSF/OD fee refunds may be available on a case-by-case basis. *Id*. While Plaintiffs suggest that documents regarding these deliberations are crucial to interpreting the transaction-level data (*see id*. at 2), the Bank disagrees and contends that "the data itself shows the relief that was provided." *Id*. at 6. Whereas Plaintiffs claim they need these documents to "determine whether Covid CAP relief was provided in accordance with those policies or if some class members received less relief than they should have under those policies" (*see id*. at 2), the Bank correctly counters by noting that "Plaintiffs' claims are not (nor could they be) for breach of [the Bank's] internal, non-public refund allowances— they turn on whether [the Bank's] *public statements* of relief were misleading." *Id*. at 6 (emphasis added). In short, the Bank notes that its reasoning or deliberations around setting its BAU allowances is irrelevant. The court agrees.

Initially, at least as to all of the internal documents sought by Plaintiffs, the court should note, as it has done previously (*see* Order (dkt. 77) at 4-7), that Plaintiffs' claims do not depend on

these sorts of internal documents. Plaintiffs' claims are centered around the Bank's allegedly misleading *public* representations about the existence of fee relief programs. As Plaintiffs put it, the pandemic caused widespread financial stress and "tremendous pressure was placed on financial institutions to support their customers through the crisis." *See* First Amend. Compl. ("FAC") (dkt. 72) at 2. In response to that pressure, the Bank "appeared to answer the call when it promised a pandemic-long relief program" related to overdraft and insufficient fund fees. *Id*. The essence of Plaintiffs' case is that the Bank "never implemented the program it promised . . . [and] [i]nstead, [it] terminated the limited changes it did implement in August 2020 without notice," while "after August 2020, [the Bank] continued to falsely claim a pandemic relief program existed as the pandemic ravaged on." *Id*. Given the essence of Plaintiffs' case, the wide-ranging discovery at issue here consists of inquiries and information that the court finds irrelevant.

Plaintiffs' disagreement with the Bank's interpretation of this court's prior discovery order (dkt. 77) is not well founded – Plaintiffs argue that the undersigned's prior ruling only "concerned the proportionality of general (primarily ESI) searches—it did not hold that all the Bank's internal documents related to [fee relief program] are categorically off limits." Ltr. Br. (dkt. 92) at 3. Perhaps not; however, Plaintiffs have failed to show that the documents and information that they seek here are relevant to any claim or defense in this case. Plaintiffs state that they now are making "a targeted request for a small subset of documents that Bank witnesses indicated are stored in defined locations . . . [along with] a more specific showing of need for these narrowly targeted materials." *Id*. However, Plaintiffs' relevance arguments are highly speculative and lack concreteness. By way of example, Plaintiffs characterize these internal documents as relevant because such "internal company policies and communications *can constitute* common proof that a defendant designed or advertised a program to impact consumers' choices in a certain way, which in turn demonstrates how a reasonable consumer would likely understand the defendant's communications." *See id*. at 3 (emphasis added). Plaintiffs add that "reports summarizing customer complaints *may reveal* information on how [the Bank's] customers understood its representations." *Id*. (emphasis added).

Because Plaintiffs have failed to establish relevance or proportionality, for the reasons

stated by the Bank (set forth herein), the court finds – as it did before (*see* Order (dkt. 77) at 6) – that the information and documents that Plaintiffs seek are not relevant to whether the Bank's public statements were misleading or whether any Plaintiffs relied on those statements, and that searching for and producing this information would be disproportionate to the needs of the case. Accordingly, Plaintiffs' request to compel this information is **DENIED**.

**IT IS SO ORDERED.**

Dated: October 30, 2024

ROBERT M. ILLMAN
United States Magistrate Judge